IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| BRYAN CHAMBERS,<br><br>       Petitioner,<br><br>vs.<br><br>CHAE HARRIS,<br><br>       Respondent. | CASE NO. 3:25-cv-1418<br><br>DISTRICT JUDGE<br>SARA LIOI<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &**<br>**RECOMMENDATION** |

Pro se Petitioner Bryan Chambers has filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Chambers is in custody at the Warren Correctional Institution and challenges his conviction and sentence in the case *State v. Chambers*, Lucas County Court of Common Pleas, Case No. G-4809-CR-0202202751. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court dismiss Chambers's Petition and Amended Petition.

**Summary of facts**

In habeas corpus proceedings brought by a person under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that

presumption by clear and convincing evidence. *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012).

The Ohio Court of Appeals for the Sixth Appellate District summarized the facts underlying Chambers's conviction as follows:

> {¶2} Chambers was indicted on one count each of kidnapping in violation of R.C. 2905.01(A)(3), a first-degree felony, and felonious assault in violation of R.C. 2903.11(A)(1), second-degree felony.[1] The charges arose from allegations that Chambers took his son, V.L., out of school when he was not supposed to, put V.L. in the back seat of his car with the child locks engaged so that the doors would not open from the inside, drove V.L. to his house, and beat V.L., causing injuries including a fractured wrist bone, petechiae from strangulation, and heavy bruising.
>
> > [FN1] He was also indicted on one count of domestic violence that was dismissed before trial.
>
> ### A. Pretrial issues
>
> {¶3} Two pretrial motions are relevant to this appeal. First, Chambers filed a request for a jury instruction on reasonable parental discipline that required the jury to find him not guilty of felonious assault if it found that he was reasonably disciplining V.L. at the time of the incident. In response, the state asked the court to deny Chambers's request because causing serious physical harm to a child—as required for a felonious assault conviction—goes beyond the scope of reasonable parental discipline. It also pointed out that the instruction was unnecessary as a matter of law because Chambers would not be entitled to the instruction if the jury found that he caused serious physical harm to V.L. and would be found not guilty if the jury found that he did not cause serious physical harm to V.L.

{¶4} Second, the state filed a motion in limine to exclude the testimony of Shawn Mahone Sr., who runs a behavior-modification boot camp program that V.L. attended in 2021. The state argued that V.L.'s interactions with Mahone were not relevant to the events of October 7, 2022, and that any testimony Mahone could offer about V.L.'s behavior months before the incident had no bearing on whether Chambers kidnapped and assaulted V.L. In response, Chambers said that Mahone would testify about V.L.'s prior "disciplinary behavior," V.L.'s prior enrollment in the boot camp program, and Chambers contacting him about a month before the incident to reenroll V.L. in the boot camp. This would show that Chambers's actions on October 7 constituted reasonable parental discipline, and excluding Mahone's testimony would prevent him from presenting evidence of his affirmative defense.

{¶5} The trial court held a hearing on the parties' motions. At the hearing, Chambers argued that the context surrounding his actions on October 7 was important; V.L.'s disciplinary issues, poor performance in school, and involvement in Mahone's program were all relevant to how Chambers handled things that day. He argued that, although V.L. suffered a broken arm, there was no allegation that he intentionally broke V.L.'s arm and the medical records indicated that there could be another explanation for the break, so it was unlikely that the state could show that he intended to cause serious physical harm. The fact that V.L. also had nonserious physical injuries, when combined with the lack of intent, made the reasonable parental discipline instruction proper.

{¶6} In response, the state argued that case law does not support using reasonable parental discipline as a defense to a charge of felonious assault. It took the position that "if evidence is produced that there is serious physical harm, the [reasonable parental discipline] instruction is not warranted." It also pointed out that V.L.'s injuries were all part of the same course of conduct, and V.L.'s broken wrist was

not the only serious physical harm that occurred during that course of conduct. Chambers also allegedly strangled V.L., which the state believed was additional serious physical harm.

{¶7} Regarding Mahone's testimony, the state argued that V.L.'s participation in the boot camp was too far removed from the events of October 7, 2022—he was there about 17 months before—and was not relevant to whether Chambers kidnapped or caused serious physical harm to V.L. It also claimed that Chambers's attempts to reenroll V.L. in the program was nothing more than an inquiry (i.e., it was not evidence that V.L. was enrolled in the program), which was also irrelevant to the charges against Chambers.

{¶8} The court denied Chambers's request for the reasonable parental discipline jury instruction. It determined that "[c]ausing serious physical harm to a child is by its very nature unreasonable discipline and therefore, the defense of reasonable parental discipline could never logically apply." It also noted that there was no precedent for using the instruction in a felonious assault case. The court granted the state's motion to preclude Mahone's testimony. Although the court believed that his testimony would be relevant to a reasonable parental discipline defense, as it stood, Mahone's testimony "would bolster a defense not available to ..." Chambers, so the testimony was irrelevant and inadmissible. The court clarified that the parties could present and discuss V.L.'s discipline issues at trial; it was only excluding a witness with irrelevant testimony about something that happened 17 months before the incident underlying this case.

## B. Trial

### 1. State's case

{¶9} Chambers's case was tried to a jury in February 2023. The state presented the testimony of V.L., the victim; Emily Johnson, the assistant principal at

V.L.'s school; Jeffrey Roberts, a security and resource officer at V.L.'s school; Jenae James, James's stepdaughter, and Elizabeth Starr, three of Chambers's neighbors; Shaliah Lacy, V.L.'s mother; officer Kerry Hayes and detective Lisa Fauver of the Toledo Police Department; and Natalie Jones, a forensic nurse.

### a. School witnesses

{¶10} Around 10:00 a.m. on October 7, 2022, Johnson, the school's assistant principal, received a call that there was a student in the bathroom with a cellphone. As she was looking for the student, whom she identified as V.L., a teacher told her that he had gone out the front door. When she reached the lobby, she saw a car in the parking lot that was "rocking ... [t]he back passenger door was open and the car was physically moving back and forth." The rocking lasted for a couple of seconds, and she did not see anyone in the car. After seeing the car, Johnson went to the office to figure out what was going on.

{¶11} Johnson explained the process for informing a student that someone has come to pick them up. Generally, the adult comes to the office and signs the sign-out sheet, the front office calls the teacher, the teacher alerts the student, and the student comes to the front office to meet the adult. Chambers signed V.L. out for an "appointment" at 10:12 a.m.

{¶12} As Johnson continued walking toward her office, she saw a man "walk out, go back to the car and then take off." She thought the situation was "obviously strange[,]" so she radioed Roberts, the safety, security, and resource officer, to discuss what she had seen. Moments later, their conversation was interrupted by Lacy coming into the office. Johnson described her as "very nervous, very fraught." At the time, Johnson knew that Lacy had temporary custody of V.L., but did not know why. Despite that, she believed that the school had an obligation to allow Chambers to take V.L. from the school because he was V.L.'s parent and guardian, and the school

5

did not have anything saying that they were not allowed to release V.L. to him.

{¶13} Soon after arriving, Lacy left the school. Johnson and Roberts decided to report the situation to Lucas County Children Services ("LCCS") but were interrupted when Lacy and V.L. returned to the school. When they returned, V.L. looked "[b]eaten up." Johnson said that his nose was bleeding, his lips were swollen, he had bruising on his abdomen, his face was bleeding, and he was cradling his arm. The nurse's aide at the school took pictures of V.L.'s injuries. In those pictures, Johnson pointed out blood on V.L.'s face, bruising on his whole torso, and redness on his stomach. He did not have those injuries when he left the school with Chambers. V.L. left the school in an ambulance. Johnson estimated that five to 15 minutes elapsed between her seeing the car in the parking lot rocking and V.L. returning to school with Lacy. Later, Johnson and Roberts finished their report to LCCS. V.L. returned to school the following Monday, but Lacy unenrolled him from the school shortly after.

{¶14} On cross, Johnson said that V.L. did not tell his teacher or anyone in the front office that he did not want to leave with his dad that day, and no teachers forced V.L. to leave with his dad.

{¶15} Roberts testified that he is in charge of daily security at the school. He described V.L. as a "pencil thin[,]" quiet kid who was not "on [his] radar" as a kid who always got in trouble.

{¶16} The state played surveillance video from the morning of October 7 that showed the front exterior of the school. On the video, Roberts identified the car V.L. left in. The video shows Chambers pulling up in front of the school, parking, and walking into the building. A little over four minutes later, Chambers comes out of the building pulling a resistant V.L. toward the car by his arms, wrists, and shirt. As they struggle, V.L. drops to the ground, but Chambers picks him up and eventually gets him in the back

6

seat of the car. Chambers briefly crawls in with him, which is when the car shifts side to side a couple of times—what Johnson described as "rocking"—before crawling out and closing the door.

{¶17} After getting a call from Johnson that something "didn't seem right" when a student left, Roberts was starting to review the security footage when Lacy and V.L. returned to the school. He said that V.L.'s "[f]ace was bloodied [and] he was scraped up." He and the school nurse treated V.L.'s injuries while someone called the police.

{¶18} Roberts called 911 after Lacy and V.L. arrived at the school. On the 911 call that the state play for the jury, Roberts told the dispatcher that a student's father had picked the student up from the school and was "beating him in the parking lot;" the student's mother came to the school, left to file a police report, drove past the father's house, saw the father beating the student, and brought the student back to the school; and EMS was already at the school checking the student, but he was "severely beat." He confirmed to the dispatcher that it was the student's father who had beaten him.

{¶19} After the ambulance took V.L. to the hospital, Roberts and Johnson reported the incident to LCCS.

{¶20} On cross, Johnson admitted that he would not be contacted about a student's grades. He was aware that V.L. had been in an "altercation" at the school and was suspended for three days as a result. Sometime after October 7, Roberts was asked to review video footage to see if Chambers was on school property. He did not see Chambers or his vehicle on the surveillance video. V.L. was the person who alleged that Chambers was at the school. V.L. also made a second unfounded allegation that Chambers was at the school.

### b. Doorbell camera video

{¶21} Chambers has a doorbell video camera that

7

faces his driveway. The state presented two sets of videos from the doorbell camera as exhibits. One set includes the videos that the police obtained from the service provider when they executed a search warrant. The other set includes the videos that Siti Dotson-Chambers, Chambers's wife, downloaded from the camera's service provider and gave to police.

{¶22} The search warrant obtained nine videos that do not contain timestamps. In the first video, Chambers's car pulls out of the driveway. In the second, he backs into the driveway, opens the back door of the car, leans into the back seat, and says, "Which way do you want to go? Go this way or that way?"

{¶23} The third video begins with V.L. struggling with Chambers, who is holding him by the wrists and dragging him toward the door of the house. The camera clearly shows V.L.'s face a few seconds into the video, and he does not appear to have any blood on him. V.L. partially breaks away from Chambers and the two stumble across the driveway to the neighbor's lawn, falling to the ground as they do so. Most of V.L. is not visible in the frame at this point, but Chambers positions himself on his knees straddling the child and places his right hand on the ground. Before putting his right hand on the ground, he uses it to pull a cellphone out of V.L.'s left hand. Although Chambers's left hand is not visible at first, he eventually shifts so that his left hand is seen pushing against V.L.'s forehead, pinning his head to the ground. His right hand appears to be holding V.L.'s left wrist against the ground. V.L. is crying during most of the video, although he is quiet for a few seconds while he is on the ground and Chambers's left hand is not visible to the camera. V.L. also says "get off me" and "I'm not supposed to be with you" while he is on the ground and Chambers is straddling him. The video lasts 30 seconds.

{¶24} In the fourth video, Chambers and V.L. are in Chambers's driveway near the door to the house. V.L. is lying on his back in the driveway and Chambers is on his knees straddling V.L.'s torso. Chambers is holding a cellphone in his right hand over his head. He says what sounds like "are you going to have this bitch at school" before throwing the phone to the ground in the vicinity of V.L.'s head. V.L. is crying and talking throughout this video. The video lasts 13 seconds.

{¶25} The fifth video begins with Chambers and V.L. very near the doorbell camera. Chambers has his arms wrapped around V.L.'s torso and is pulling him toward the house. V.L. breaks away from Chambers and stumbles across the driveway toward the neighbor's lawn. He trips in the process and lands on his back. As he is falling, his face is briefly in the frame and his mouth appears bloody. While V.L. is on the ground, Chambers is standing and leaning over him. He says something that sounds like "keep your ass still." Around the time that V.L. is stumbling, a woman in the background begins screaming. Shortly after, Starr runs up and screams at Chambers, "Bryan, what are you doing? Bryan, what are you doing? Stop." Chambers turns to look at Starr the first time she yells, stands up the second time she yells, and backs away from V.L., turns toward the house, throws up his hands, and walks toward the house the third time she yells. When Chambers backs away from him, V.L. gets up, steps away from Chambers, waits a couple of seconds, walks behind Chambers to grab the cellphone from the driveway, and then runs out of the frame. Until Starr screams at Chambers, V.L. is crying. Soon after V.L. exits the frame, the woman screaming in the background stops and a silver car speeds down the street away from Chambers's house. Chambers watches the car drive away then turns back to face the area where Starr was briefly visible on the video and says, "He wrestlin' with me. Shit." The video lasts one minute and 13 seconds.

9

{¶26} The sixth video shows Chambers backing his car further into the driveway. The seventh video shows Chambers walking from the house to his car and back while on the phone. The camera picked up parts of his conversation including, "I couldn't even get him in the house," "we outside tusslin' and shit," and "the neighbors come out." In the eighth video, Chambers walks out of the house and gets in his car while talking on a headset. Much of what he says is unintelligible. The final video shows a mail carrier delivering mail.

{¶27} Dotson-Chambers gave the police five videos from the doorbell camera. Four of them have audio and include timestamps. The video that does not have timestamps or audio is a cellphone screen recording. Three of Dotson-Chambers's videos match videos from the search warrant. The video that begins at 10:20:16 a.m. and ends at 10:20:46 a.m. corresponds with the third video from the search warrant. The video that begins at 10:24:10 a.m. and ends at 10:24:22 a.m. corresponds with the fourth video from the search warrant. And the video that begins at 10:28:03 a.m. and ends at 10:29:13 a.m. corresponds with the fifth video from the search warrant.

{¶28} The video that begins at 10:25:49 a.m. and ends at 10:27:56 a.m. is not in the search warrant videos. In this video, Chambers and V.L. are in the driveway near the doorbell camera. The video starts with Chambers standing with his legs straddling V.L., who is lying on the driveway. Chambers is bent at the waist with his hands in front of him. The camera angle makes it difficult to tell whether his hands are on his knees or on some part of V.L.'s body. He squats down and begins talking to V.L., but he is speaking softly and there is a dog barking in the background, which makes what he is saying mostly unintelligible. During the first 50 seconds of the video, in response to Chambers, V.L. says "I'm not," "no, I haven't," "dad," "no, you're not," and "I'm not supposed to be with you." Around the 50-second mark, V.L. starts making noises that sound like

10

coughing. A few seconds later, Chambers says something about V.L. "crying." Chambers's arms and hands are between his knees the entire time he is squatting.

{¶29} At one minute and eight seconds into the video, Chambers stands up and leans over V.L. again. Chambers's left hand is barely in the frame but looks like it is positioned near V.L.'s neck or upper chest, and V.L. is either coughing or crying. Chambers's right hand is not visible. While Chambers is standing there, he and V.L. apparently discuss Chambers's and Lacy's custody arrangements. V.L. does not seem to have any difficulty speaking. The whole time, V.L. insists that he is supposed to be with Lacy and that "the judge gave mom papers ..." about V.L.'s custody. After about 40 seconds of this, Chambers begins saying "okay, you can stay at her house, but you still will be held responsible for what" but he abruptly cuts himself off midsentence when V.L. again says "but I'm not supposed to be with you." At this point, Chambers hits or smacks V.L. in the face or head. It is difficult to tell exactly what happens due to the camera angle. He yells at V.L. to "shut that shit up" as he grabs the child by his right wrist and the front of his shirt near the collar to drag him into the house. V.L. begins screaming and crying when Chambers hits him, which continues until the end of the video.

{¶30} The final video—the screen recording—shows 53 seconds from the second half of the video that begins at 10:25:49 a.m. (i.e., it starts when Chambers is standing and bending over V.L. and ends at the same time as the 10:25 video), but without any audio.

### c. Lacy's testimony

{¶31} Lacy is V.L.'s mother. She described him as a small, loving kid who is "rambunctious, jumping all over the place, loves video games." Chambers is V.L.'s father, but she and Chambers did not have any formal custody arrangements for V.L. and his

11

brother, W.L. ("brother"), until a few years before this incident. She said that V.L. was having some behavioral issues so Chambers offered to have V.L. live with him, while brother lived with Lacy. That lasted for about two months before Chambers brought V.L. back to Lacy. About a year later, in November 2019 or 2020, Chambers decided he wanted V.L. to live with him again. At that point, V.L. was fine with the custody arrangement. However, at the end of December 2022, V.L. ran away from Chambers's home.[2] He was only gone for a few hours and Lacy found him nearby later that day. Lacy reported that he ran away because "he was being mistreated and he was scared of being beat again." She took him home with her, and the next day, she went to the juvenile court to get an emergency custody order to "have [V.L.] in [her] home until we figure out what's going on." According to Lacy, V.L. knew of the custody situation, and she believed that Chambers knew of it as well because he acted like he knew the custody arrangements were different. She said that they had several phone conversations about it, she was taking V.L. to and from school, and she had asked to pick up V.L.'s belongings from Chambers's house.

> [FN2] Although Lacy said V.L. ran away in December 2022, the rest of her testimony and the other evidence in the case reflects that he ran away before the October 7, 2022 incident underlying this case, not after.

{¶32} The morning of October 7, Lacy received a call from V.L. According to her, he said "'mom, I need you to come get me. I'm in the bathroom at school and my dad is here to pick me up and I'm scared.'" She said that he sounded "terrified." She got to the school about six minutes after he called, but he was already gone. When she found out from office staff that V.L. was gone, she "lost it" because she had given them paperwork and let them know that she was "afraid that Bryan is going to beat this child."

{¶33} Someone at the school told her she should make a police report. When she passed Chambers's street on the way to the police station and saw his car in the driveway, she drove toward the house and called 911. The state played the call for the jury. In it, Lacy reports that she is having a dispute with her child's father, she is at the father's house, she has a court order saying that the child is to remain in her custody, the child called from school crying to tell her that his father was there to get him, and she was scared for the child's safety. She tells the dispatcher that Chambers lives at the house. After giving the dispatcher Chambers's name, Lacy begins screaming. Most of what she is screaming is unintelligible, but she clearly says "please" repeatedly. When the dispatcher asks her what is happening, Lacy tells her that "he's hitting him," "my son is screaming," "come now," and "my neighbor saw him." Lacy also reports that V.L. is bleeding, but that she has him in her car and that she is taking him to the police station. She later tells the dispatcher that she is going to V.L.'s school. She says that "he beat [V.L.] up" and that V.L. was bleeding from his face. She is crying and sounds distraught throughout the call.

{¶34} When she pulled up to the house, Lacy saw Chambers and V.L. outside "tussling" and V.L. crawling on the ground trying to get away and "screaming with all his might." She also saw Chambers "doing a lot of the beating ...." Lacy said that she was "frantic" on the 911 call because "the way that the situation is with [her] and [Chambers], to run up there, he was going to knock [her] out anyway, ..." she was scared, she was unsure of what to do, and she needed help.

{¶35} Chambers's neighbors came outside after Lacy started screaming, and Lacy thought it was "like something clicked" for Chambers and he stopped. When that happened, she told V.L. to run and get in the car. Once he was in the car, Lacy took him back to the school because he was bleeding "profusely,"

13

she "really couldn't think straight[,]" and the school, which was about "three streets" from Chambers's house, was the first place she thought to go. V.L. was acting hurt, stunned, shocked, and lethargic.

{¶36} When they got back to the school, Lacy took V.L. into the office. She told the staff that she needed help and "that this was going to happen." Someone took V.L. to the nurse's office where he was cleaned up and pictures of his injuries were taken while they waited for the police and medical help to arrive.

{¶37} Although an ambulance took V.L. to the hospital, Lacy was unable to go with him because she had to pick brother up from school. Later, she joined V.L. at the hospital, and learned that he was diagnosed with petechiae, "several bruises, busted nose, [and] busted lip." He also received a referral to an orthopedic surgeon for a wrist injury. According to Lacy, the emergency room "knew something was wrong" with V.L.'s wrist, "but they didn't have the equipment to diagnose it." The orthopedic surgeon later diagnosed him with a right wrist fracture "with a foreign object inside." He wore a cast for a month and the object is still in his wrist. The cast made his life more difficult because he needed assistance showering and was unable to write to do his schoolwork. He is right-handed, so any "daily living tasks" were difficult for him. Since the incident, V.L. is "not doing very well." He is "emotional" and his "self-worth has been destroyed because [he] loves his father."

{¶38} Finally, the state showed Lacy some text conversations between her, Chambers, and Dotson-Chambers. In a message from September 28, 2022, Chambers wrote "V.L. still will answer[.]" Lacy interpreted that to mean that even though V.L. was gone, Chambers "was still going to whoop him, he was still going to beat him."

{¶39} On cross, Lacy explained that until she got the emergency temporary custody order, V.L. lived with Chambers during the week and brother lived with

14

her during the week, and the children spent the weekends together alternating between her house and Chambers's house. This was "[s]omewhat" because of Lacy's difficulties with disciplining V.L.

{¶40} Regarding the emergency order awarding Lacy temporary custody of V.L., Chambers' attorney presented Lacy with a docket sheet from the juvenile court showing that Lacy's motion was served on "mother," Chambers filed a motion for a continuance because he had COVID, the juvenile court magistrate held a hearing the same day that Chambers filed his motion for a continuance, and the magistrate's decision granting emergency temporary custody was mailed to Chambers the same day he filed his motion for a continuance. Lacy said that she "talked to [Chambers] verbally" about the emergency custody order. She did not remember texting Chambers that he was not allowed to have any contact with V.L. but said that she "told him that."

{¶41} When defense counsel questioned Lacy about V.L.'s medical history, she acknowledged that his records from the emergency room did not show any wrist fractures or malalignment. However, his medical records from the orthopedic surgeon showed a distal pole scaphoid fracture, including findings of one x-ray said that V.L. had a "[h]ealed a distal pole scaphoid fracture." Lacy said that V.L. did not play sports, he did not hurt his wrist before October 7, and she did not recall a time when he fell off a skateboard and she returned him to Chambers with a wrap around his wrist. She also acknowledged that V.L. has asthma, which sometimes causes him to cough. V.L. was in counseling before this incident with his father. She was not taking him to counseling when he was living with Chambers, so she did not know how frequently he was going to appointments when he did not live with her full-time.

15

### d. V.L.'s testimony

{¶42} V.L. was 14 years old at the time of trial. He testified that he has ADHD, and that he sometimes gets in trouble at school for talking to his classmates.

{¶43} On October 7, 2022, V.L. was living with his mother. Before that, and before he ran away, he was living with Chambers; Dotson-Chambers; brother; and B.C., his younger sister ("sister"). He claimed that Chambers and Dotson-Chambers treated him worse than they treated brother and sister. Specifically, when brother was not at the house on weekends, Chambers "beat" V.L., and Chambers and Dotson-Chambers "always give [sister] what she wanted and even if she didn't, they always blamed [him] and beat [him]." He said that both sister and brother were sometimes around when he was hit. V.L. did not like living with Chambers because Chambers "kept beating" him. He claimed that he ran away because he "didn't want to get beat anymore." He went to Lacy's house because he felt safer there.

{¶44} The state showed V.L. several text messages from Chambers's phone to V.L.'s phone number. Among them was a message that said "[y]ou getting whooped[.]" Chambers had "whooped" V.L. before, and V.L. was scared it would happen again. There was also a message that said "I'm beating yall ass put the dog on the cage[.]" The day V.L. ran away, Chambers sent a message that said "[s]on you just made it worse[.]" The last message, sent about a week before Chambers got V.L. from school, said "[e]njoy yourself while you can[,]" which scared V.L. Although he was living with Lacy at that point, he was scared of Chambers "coming for" him and beating him.

{¶45} On October 7, V.L.'s teacher told him that his father was at the school to pick him up. When he learned that, he called Lacy from the bathroom. He went to the bathroom so that neither Chambers nor the teachers would see him. He thought that

Chambers was there to "pick [him] up and beat [him]." After V.L. called Lacy, a teacher took him up front. When he got there, Chambers "opened the door and grabbed [him]." He appeared angry, but V.L. did not know why. He did not want to leave school and did not want to go with Chambers. According to V.L., he was not supposed to be with Chambers and did not have an appointment scheduled that day.

{¶46} When he and Chambers got to the car, Chambers "threw" V.L. in the back seat. As V.L. described it, Chambers "picked [him] up and stuffed [him] in the car." Chambers hurt V.L. when he grabbed him. Chambers initially climbed in the back seat with him and "banged [V.L.'s] head on the door." He was not really able to fight back because Chambers is much bigger than him. Altogether, he estimated that Chambers hit his head 10 to 15 times. Although he tried, V.L. could not open the doors to get out of the car because the child locks were on. After closing the back door of the car, Chambers got in the driver's seat and drove away from the school. V.L. described him as "being mean[,]" insulting V.L., and saying that "he couldn't wait to get [V.L.], he said he couldn't wait to do this." Chambers drove home. V.L. did not want to go because he knew that Chambers "was going to beat" him, but he did not have a choice and could not escape.

{¶47} When they got to the house, Chambers "dragged" V.L. out of the car and when V.L. tried to run, Chambers "tackled" him. V.L. was scared when Chambers tackled him. After tackling V.L., Chambers attempted to choke him by putting both of his hands around V.L.'s neck.

{¶48} After this, the exact sequence of events is not entirely clear from V.L.'s testimony. V.L. testified that Chambers first choked him by putting both of his hands around V.L.'s neck, then punched him in his chest and face. At one point, he and Chambers were on the ground. Chambers kept him on the

ground by sitting on him and holding his arms down. Next, Chambers started punching V.L. more. Then, V.L. said that when Chambers finished choking him "[h]e switched to his forearm and put his arm around [V.L.'s] neck ...." V.L. had trouble breathing and asked Chambers to stop. After that, Chambers stopped choking V.L. and "got tired and stopped punching [V.L.]." Although Chambers stopped choking and punching V.L., he continued to hold V.L.'s arms so that V.L. could not escape. This is when V.L. told Chambers that he was not supposed to be with Chambers, and Chambers responded that he had "papers" in the house. V.L. did not want to go into the house because he was scared.

{¶49} Eventually, some of Chambers's neighbors came outside and yelled at Chambers to stop. Although it took Chambers a while, he eventually stopped hurting V.L. This enabled V.L. to escape with Lacy. V.L. reiterated that he did not want to be with Chambers that morning but did not feel free to leave and was physically unable to get away because Chambers is much bigger than him.

{¶50} When he and Lacy left Chambers's, they went back to school. At the school, someone took pictures of "what [Chambers] did to ..." him and called an ambulance. V.L.'s face was bloody, which happened because Chambers punched him in the face. Before leaving school with Chambers that morning, V.L. did not have any injuries to his neck, bruises on his chest, or pain in his wrist.

{¶51} When the ambulance arrived at school, it took him to the hospital. While he was there, someone took more pictures of his injuries. He said that his "whole body" hurt. His right wrist hurt because Chambers "put his hands on it when [V.L.] was on the ground." V.L. was eventually diagnosed with a broken wrist, which required him to wear a cast. He did not like wearing the cast because it prevented him from doing things he liked to do and his hand hurt inside of it. At trial, V.L. showed the jury "a bump and a black dot with red marks" on his wrist

18

that he did not have before the morning of October 7, 2022.

{¶52} On cross-examination, V.L. discussed one of his former schools. He said that he got in trouble at that school, including being involved in a fight and talking in class. He denied that there was a time when he ran away from that school, which required a teacher to make sure that he stayed in the building.

{¶53} At the school he was attending on October 7, he was getting Bs, Cs, and Ds, but denied getting any Fs. He described these as "[f]air" grades and said Chambers cared a lot about his grades. Although he denied getting into trouble at school, when Chambers's attorney questioned him about specific incidents, he admitted to "throwing a glacier at the wall outside[,]" bringing his cellphone to class a few times, reading a book or comic book instead of paying attention in class, and sneaking food into class. He denied falling asleep in class, falling out of his seat in class, being written up for a uniform violation, or stealing food from the school.

{¶54} V.L. denied ever falling off a skateboard and hurting his wrist.

{¶55} V.L. said that he did not tell his teachers that he did not want to leave school with Chambers and denied telling the nurse at the hospital that he made that statement to his teachers. He also denied calling Lacy from the car. He said his statement to the hospital nurse that Chambers tore his school sweatshirt off of him and he could not find it was true. He was only wearing the shirt when he ran away from Chambers because he had put it back on.

{¶56} V.L. clarified that "beating" meant that Chambers "would get his belt and beat [V.L.] whenever he got mad at [V.L.] for anything." He recalled telling a forensic interviewer that Chambers had hit him with a belt over 100 different times. However, despite attending counseling

19

sessions without Chambers present once a week, he had not disclosed that abuse to his counselor.

{¶57} Regarding text messages from Chambers, Chambers's attorney had V.L. read a series of messages from June 4 that began with the message from Chambers's phone to V.L.'s phone number that says "[y]ou getting whooped[.]" That message was sent at 9:56 p.m. The next message, sent at 9:57 p.m., says "I told you not to argue with a eight year old[.]" The following message, also sent at 9:57 p.m., says "[o]h more fun for me[.]" The final message from Chambers's phone, sent at 9:58 p.m., says "[d]on't get on your phone or the computer[.]" Soon after, a message from V.L.'s phone number was sent to Chambers's phone. This message says "[sister] I know this u dad don't text he calls[.]" V.L. confirmed that sister was eight years old and admitted that the message telling him not to be on his phone or computer came from sister.

### e. Neighbor witnesses

{¶58} Three of Chambers's neighbors also testified. James, one of Chambers's next-door neighbors, testified that she knew V.L. and described him as a quiet, polite, and respectful kid. About a month before October 7, she received a text message in a neighborhood group chat from Dotson-Chambers asking everyone to check their doorbell cameras because V.L. had run away.

{¶59} The morning of October 7, James was in her kitchen when she heard some "kind of high-pitched" screaming. She assumed that it was coming from her stepdaughter and her friend upstairs, so she did not "really think much of it." When she realized that it was not the girls making noise, she and the girls went outside to investigate. James saw Chambers and V.L. in their front yard, saw another neighbor on her porch, and noticed that some type of "altercation" was happening. Although it was "sort of a blur[,]" she remembered that V.L. was trying to get away from Chambers. When she first came

20

outside, she thought that V.L. was "in the motion of getting up. So he wasn't exactly on the ground, but he was not fully up." During the incident, James turned around briefly, and when she turned back V.L. was running away. He looked "terrified." She did not notice whether V.L. had any injuries to his face. James also saw a car pull up in front of the house and heard the woman in the car screaming.

{¶60} James's teenaged stepdaughter testified that she and her friend were in her upstairs bedroom when she heard "screaming and loud noises." Although the noises were quiet at first, she eventually looked out the window and saw "the next door neighbor, him and his son. They were arguing and he was like on top of him." She clarified that "Bryan was on top of the little boy." She said that "[h]is hands were on the ground while he was sitting on top of him like ... he was trying to hold himself above him, if that makes sense." However, she later said that she could not remember whether Chambers's hands were on the ground or on V.L.'s body. V.L. was lying on the ground and it looked like his mouth was red, but she could not remember what V.L. was doing beyond lying there. She estimated that Chambers was on top of V.L. for around 10 minutes.

{¶61} Stepdaughter and her friend eventually went back to what they were doing. Later, they went back to the window and saw Chambers trying to "drag" V.L. into the house and "being rough with him[,]" which prompted them to run outside. Once they were outside, stepdaughter saw that another neighbor was screaming, V.L. had gotten loose, and Lacy was on the other side of the street in her car. V.L. ran to Lacy and they "sped off."

{¶62} Finally, Starr, Chambers's other next-door neighbor, testified. She described V.L. as skinny, on the tall side for his age, very kind, and considerate.

{¶63} Starr saw Chambers that morning as she was walking back from taking her children to the bus

stop. He told her that it was going to be a good day because he was going to see his boys at school.

{¶64} Between 10:00 and 10:30 a.m., she heard "blood curdling screaming" from outside. She looked out and saw that Lacy was screaming from her car. She also saw Chambers and V.L. next to Chambers's driveway. Chambers was "standing over [V.L.] with his hands on him ... bent down." V.L. was lying on the ground motionless; he was not fighting back or resisting. Starr thought that V.L. "could not be getting air ... [and] was in grave danger." She did not believe that what she saw was an appropriate interaction between a parent and child.

{¶65} Starr ran toward Chambers and V.L. and screamed at Chambers three times to try to get him away from V.L. She said "Bryan, stop, Bryan, what are you doing, and Bryan, stop." After Starr screamed at him, Chambers stepped away from V.L. When V.L. stood up, he had blood on his face. At that point, V.L. ran to his mother's car, and they drove away. After V.L. and Lacy left, Chambers twice said "'He came on to me first.'" Starr said that she went outside and got involved that day "[b]ecause nobody deserves any level of violence like that, no matter what."

{¶66} Starr knew that Chambers and Dotson-Chambers had a doorbell camera at their house. She saw some video from that morning but said that it "didn't show anything that happened that [she] saw." She thought that it "looked to [her] like [Dotson-Chambers] had or somebody had edited videos and cut out certain parts of them."

{¶67} As the prosecutor reviewed the doorbell camera video with her, Starr said that she had seen only three of the videos before trial, and some of the videos that the state played included footage that was cut out of the videos that Dotson-Chambers sent her.

22

{¶68} On cross, Starr admitted that, although she had seen that Chambers had V.L. "pinned down," she did not see Chambers hitting or dragging the child. Nor did she hear V.L. tell Chambers to stop hitting, punching, or choking him. She also admitted that she had met with and reviewed the videos with the prosecutors but refused to meet with the defense attorney. On the video that begins at 10:25:49 a.m., Starr heard Chambers and V.L. talking on the video. Specifically, she heard V.L. say "no, I haven't" and "dad, dad, I'm not supposed to be with you[.]"

### f. Police witnesses

{¶69} Hayes is one of the officers who responded to V.L.'s school on a report of an assault involving a student. By the time he got to the school, the other responding officers were mostly finished with the call, but he discussed the incident with them and saw pictures of V.L.'s injuries.

{¶70} Later that day, Hayes heard that another officer who had been at the school was going to Chambers's house, so he went there to assist. As he was leaving the house, he saw what appeared to be drops of blood on the steps near the driveway, which he photographed. Hayes heard the other officer at the scene ask Chambers about the blood on the step but could not hear Chambers's answer. Although Hayes could not "recall specifically" what the other officer said in response, he testified that it was "oh, that's his blood or oh, that's your son's blood."

{¶71} Detective Fauver, who investigated this case, was called to the hospital by another TPD officer who suspected that the case involved a felony. She thought that V.L. "looked beat up." She described him as "tired, exhausted, broken, battered, beat ... [t]raumatized." She did not press him too much for information to avoid further traumatizing him. Later, she was present during his forensic interview. During his interview, he seemed sad and traumatized, and his arm was in a sling.

23

{¶72} After visiting the hospital, Fauver went to Chambers's house. As she and the officer with her were leaving, they noticed the blood on the porch. According to her, the officer with her said, "'Is that blood?' And [Chambers] stated, 'That's my son's blood.'"

{¶73} As part of her investigation, Fauver reviewed the surveillance video from the school. Although V.L. did not appear to be fighting Chambers as he was getting in the car, he "looked afraid like he did not want to go with this man."

{¶74} Regarding the video footage from the doorbell camera, Fauver said that she learned about the existence of the doorbell camera from LCCS. Once she knew about the camera, she tried to get the video footage. She contacted the camera's service provider, which told her that the account for Chambers's house is in Dotson-Chambers's name and that she would need a warrant to access the video. Eventually, she got a warrant and the video, but it was not time stamped and it was different from the footage that Chambers eventually provided in discovery. Fauver explained that any footage from the doorbell camera could be deleted once it is downloaded from the cloud and any footage that is not requested from the service provider is deleted from the cloud after 72 hours. When she eventually received footage from the service provider, she thought that "there was minutes missing" from the footage.

{¶75} On cross, Fauver said that she reviewed Jones's report from the hospital and saw that V.L. told someone at school that he was scared to go with Chambers but they made him go anyway, which contradicted his trial testimony.

{¶76} When Fauver decided to charge Chambers, she knew that he was V.L.'s custodial parent, but also knew that Lacy had been awarded possession of V.L. Chambers's counsel pointed out that Fauver had testified at an earlier hearing in the case that Lacy

24

had custody and Chambers did not have custody of V.L. because of abuse allegations, despite understanding that possession and custody are different, all of which Fauver admitted. At the time she filed charges, she knew that Lacy had given her and the school a copy of the order awarding Lacy possession of V.L. During the investigation, Fauver learned that Dotson-Chambers was served with a copy of the juvenile court's order and that Chambers emailed the juvenile court to request a continuance of the hearing. After walking through the juvenile court's docket and some of the filings from that case with Chambers's attorney, Fauver admitted that Chambers was not personally served with the order awarding Lacy possession of V.L., which was mailed to Chambers's home address on the same day it was granted. However, on redirect, Fauver read a text message that Chambers sent to Dotson-Chambers on September 15 showing that he knew Lacy had filed for custody of V.L. The next day, Fauver saw that he sent Dotson-Chambers a text that said "I will get him i got a plan[.]"

{¶77} Finally, Fauver said that it looked like V.L. was pulling away from Chambers as they were leaving the school but not like he was fighting Chambers. When counsel asked what Fauver would do "[i]f an arrestee was doing that, ..." Fauver said that she would "charge them with resisting."

### g. Jones's testimony

{¶78} Jones is a forensic nurse who treated V.L. at the hospital and testified as an expert in forensic nursing. When V.L. arrived at the emergency room in the ambulance, he was "pretty serious, very solemn. And he made a statements [sic] of anxiety." V.L. reported that Chambers had come to school to pick him up and "initially started hitting him because he had run away and his grades were bad." V.L. claimed that Chambers "drug him to his car and threw him in the back seat, then climbed in and was smashing his head on the door." When V.L. tried to get away after they got to Chambers's house,

Chambers "threw him to the ground, sat on top of him and strangled him using two hands at first and told him he would continue to strangle him if he tried to get away." V.L. was trying to get Chambers off of his neck when Chambers switched to using his forearm to apply pressure to V.L.'s neck. At this point, a neighbor "was pleading to get him to stop ... [,]" which is when V.L. was able to get away and run to Lacy's car.

{¶79} V.L. also reported that Chambers "punched him in the face when he was on top of him and he was covered in blood[,]" but when in the sequence of events this happened is unclear. He also claimed that Chambers ripped his school sweatshirt off of him at some point and that the sweatshirt was currently missing.

{¶80} Jones's physical examination of V.L. found numerous injuries, which she photographed and documented in his medical records.

{¶81} On V.L.'s head, Jones documented tenderness at the back of his head; bruising on the right and left sides of his jaw; dried blood inside his nose and on his lips; and petechiae on the soft and hard palates on the roof of his mouth. On V.L.'s neck, in addition to linear abrasions on the front and back, Jones documented several injuries that she found significant: (1) abrasions on the right side of the neck that included "multiple small linear and crescent shaped ..." areas of redness; (2) an area of red, crescent-shaped abrasions on his lower left jaw; (3) "a 9 centimeter patterned red abrasion to left neck in diagonal formation[;]" and (4) four red, crescent-shaped abrasions at the base of the left side of his neck above the collarbone, three of which were in a semicircle. Below V.L.'s neck, Jones documented bruises in the middle of his abdomen, above his belly button, and on the right side of his chest; abrasions on the back of his right hand, palm of his right hand, right knee, left wrist, back of his left hand, and left knee; tenderness on his right hip; and dried blood under his fingernails.

26

{¶82} The state also presented Jones's photographs of V.L.'s injuries, including some that she took using a contrast filter designed to make the injuries more visible. Although some of the bruises and abrasions were indistinct and difficult to see, the pictures clearly show dried blood in V.L.'s nose, petechiae in his mouth, and areas of crescent-shaped abrasions on his neck.

{¶83} Regarding the significance of the findings on V.L.'s head and neck, Jones, who has received training about strangulation, explained that a person can be strangled "by forearm, by hands, by ligatures or something wrapped around their neck." There are often "absolutely no signs, no injuries" with strangulation, so diagnosis is made "by history if the patient is reporting any pressure to the anterior lateral portion of the neck." When Jones gets a history from a child who was strangled, she wants to know how they were strangled, how long the strangulation lasted, if they think they lost consciousness, and who the perpetrator was. It is important for her to find out who the perpetrator is to make sure that the hospital is not discharging the child to a potentially unsafe environment.

{¶84} In addition to clues in a patient's history, there are some specific physical injuries indicative of strangulation that Jones looks for, including crescent-shaped abrasions at the lower jawline and petechiae. Crescent-shaped abrasions are often self-inflicted when a person is trying to stop someone from strangling them and are "often indicative of somebody trying to pull somebody off of their neck ... trying to release that pressure." In the context of strangulation, these types of abrasions "[u]sually" come from fingernails. Jones said that the location of V.L.'s crescent-shaped abrasions was significant because he told her "that he had hands applied to the interior [sic] portion of his neck .... [H]e had pressure applied in that area so that is consistent with strangulation."

27

{¶85} Petechiae result when small blood vessels called capillaries burst because they are put under pressure and usually occur "above the level where strangulation occurs." Capillaries exist where the venous and arterial systems meet to help exchange blood flow between the two. If the venous system is occluded while the arterial system continues to pump blood to the head, blood is not able to flow out of the head, which adds additional pressure to the head or brain. This results in "pinpoint like red or purple spots[,]" i.e., petechiae. Jones found the presence of petechiae on V.L.'s body significant because it indicated strangulation. The petechiae became more significant to Jones when combined with the abrasions around V.L.'s neck because "it correlates with his history of what happened to him, that he was strangled."

{¶86} Based on V.L.'s history and her findings, Jones ordered a CT angiogram, which she called the "gold standard for strangulation." She described this test as "tak[ing] lots of x-rays and several views to allow dye to be injected during that time [to] see if there's any injury to the blood vessels." The results showed "soft tissue density" around his left carotid artery that "may represent hematoma or lymphadenopathy ..."—which Jones described as "a collection of blood or swelling"—and was different from his right side. Jones found this result significant because it also correlated with strangulation.

{¶87} On the whole, based on her education, training, and experience in forensic nursing, Jones believed that V.L.'s injuries were consistent with manual strangulation.

{¶88} The other major physical complaint V.L. had was pain in his right wrist. Doctors ordered x-rays of the wrist and gave V.L. a splint. According to his medical records, V.L. was later diagnosed at a pediatric orthopedic surgery practice with a right distal pole scaphoid fracture.

28

{¶89} Before V.L. left the hospital, Jones developed a safety plan for him that involved, at the suggestion of an LCCS supervisor, Wood County Children Services investigating the incident and V.L. remaining at Lacy's house until the investigation was complete.

{¶90} On cross-examination, Chambers's attorney took Jones through some of the information in V.L.'s medical records. Counsel asked Jones about several of V.L.'s lab results that were outside of normal reference ranges, but she was unable to interpret the results because she is not a doctor, and those particular tests are not relevant to her practice as a forensic nurse. She said that the finding on the CT angiogram of possible lymphadenopathy meant that V.L. might have had a swollen lymph node, which could indicate "[a] lot of different things[,]" including increased fluid in the area or an infection. Nothing in the records indicated that V.L. experienced loss of consciousness. Additionally, V.L. was previously diagnosed with uncomplicated, moderate, persistent asthma, which he treats with a nebulizer and an inhaler.

{¶91} Regarding V.L.'s wrist fracture, both of his wrists were x-rayed in the emergency room, and the findings from each set of x-rays showed no fractures. As part of a neurological exam, V.L.'s right-hand and left-hand grasp were each found to be strong.

{¶92} When V.L. first saw the pediatric orthopedic surgeon about a week after his emergency room visit, the doctor did not obtain any new x-rays of his right wrist, but said that a review of the x-rays from the hospital "demonstrate[d] a concern for a nondisplaced distal pole scaphoid fracture on the right." The assessment note from this visit also indicates that V.L. had a "[r]ight distal pole scaphoid fracture, nondisplaced and questionable foreign body on the volar side of the wrist; the palm." When V.L. went back to the orthopedic surgeon a month later, a new x-ray showed a healed fracture in his

29

right wrist. Jones said that an x-ray would not be able to tell how long ago the fracture happened.

{¶93} To obtain her history of the event, Jones talked to V.L., his principal, who rode to the hospital with him, and Lacy. She did not talk to Chambers because he was not at the hospital and, although it would have been helpful, she was not able to view any of the videos of the incident. In her own notes, Jones wrote that V.L. told school staff that he was scared to leave that day. She also confirmed that V.L. told her that Chambers had ripped his sweatshirt off of him but clarified that she "said that it was missing because it wasn't there" at the hospital with him.

{¶94} V.L. did not explain to Jones how he was trying to get Chambers's hands off of his neck or tell her that he scratched himself while he was doing it, and she could not say for certain that the marks on his neck came from fingernails. When counsel asked if the abrasions on V.L.'s neck could have been caused by Chambers pulling V.L.'s sweatshirt from the back and wrapping the collar of the shirt around V.L.'s neck, Jones said that it "would be unlikely .... Usually when you have marks like that, it is a ligature mark so it is a single mark. So if you're pulling somebody even by a sweatshirt and you're pulling them backwards, you are going to have like a single line, not individual spots."

{¶95} Jones also expanded upon her explanation of how petechiae are caused. She explained that they usually happen when "pressure is applied to the interior [sic] portion of the neck or lateral portion of the neck to the point where the venous system is occluded, causing that increased pressure because the arterial system is still allowing blood to get into the brain. And so the venous system is not allowing that blood flow to leave the brain. Therefore, those capillaries then burst." She also said that petechiae can be caused by any number of things including vomiting, medications, strep throat, coughing, and asthma. However, her opinion that the petechiae in

30

V.L.'s mouth came from strangulation would not change if she knew that he was screaming and coughing during the incident. She was already aware that V.L. had asthma but was not aware that he had been sent home from school a few weeks earlier because he was vomiting.

{¶96} Finally, counsel showed Jones pictures of the right and left sides of V.L.'s face. Jones noted in her report that there was bruising on the right side but did not note bruising in a similarly discolored area on the left side. In her testimony, she said that she thought both areas of discoloration were bruises because V.L. "said he was punched in the face."

{¶97} On redirect, Jones clarified that infection or asthma would not cause all of the injuries V.L. had when he came to the emergency room. And although the radiologist at the hospital did not notice the wrist fracture, V.L. did report that his wrist hurt, and it was not abnormal for a specialist in pediatric orthopedic surgery to diagnose a fracture at a follow-up visit that was missed during an initial visit in the emergency room.

{¶98} Ultimately, to reach her conclusions, Jones looks at the "full picture," not any one piece of evidence in isolation. In this case, the entirety of the evidence indicated to Jones that V.L. "was strangled and abused."

{¶99} After Jones testified, the state rested.

### 2. Chambers's case

{¶100} When the state rested, Chambers moved for acquittal under Crim.R. 29, which the court denied. After the court denied his motion, Chambers presented the testimony of Dotson-Chambers, Maleeka Kynard, Dotson-Chambers's coworker, and brother. He also testified in his own behalf.

31

### a. Dotson-Chambers's testimony

{¶101}  Dotson-Chambers  and  Chambers  are married. They are sister's parents, and she is V.L. and  brother's  stepmother.  Dotson-Chambers described Chambers as a loving father who likes to take his children to the movies and play basketball with them. The family would go fishing, watch movies at home, and go on vacations together. A few weeks before V.L. ran away, the family took a trip to Florida. There were no issues with V.L. on that trip.

{¶102} Dotson-Chambers confirmed that V.L. lived with them during the week and every other weekend for about a year prior to the incident underlying this case. V.L. ended up living with Dotson-Chambers and Chambers full-time after Lacy and Chambers had  some  type  of  dispute  over  Chambers  not returning the children at an agreed time. Lacy got police  involved  in  the  situation,  and  when  the officers  determined  that  Chambers  was  V.L.'s custodial parent, they "made her leave [V.L.] there and she took [brother] and then [V.L.] just stayed with [Dotson-Chambers and Chambers] from there on out until he ran away." V.L. was getting "really bad grades" at the time.

{¶103}  Dotson-Chambers  characterized  her relationship with V.L. as "pretty well. We never had any problems. He's never been disrespectful towards me, do what I ask him to do." She said that V.L. and sister  have  a  "love-hate  sibling  relationship." Although "they act like they hate each other when they're together," they miss each other when V.L. is gone. She and Chambers treat V.L. and sister, who is  about  five  years  younger  than  him,  "age appropriate,  but  the  same."  The  children  are expected to complete the same chores and receive the same allowance.

{¶104} Dotson-Chambers testified about Chambers's parenting  style  and  disciplinary  methods.  She described him as "firm, he has high expectations of the children but overall he is just the more laid

back." Dotson-Chambers would not say that she and Chambers were strict with V.L., but they "basically just tried to steer [him] in the right direction." She knew that Chambers thought that V.L. "kind of reminds him of himself, hard headed, not listening, and he didn't want [V.L.] to take the same road he took." Dotson-Chambers went on to say that there were "cultural differences" between black parents and white parents. She believed that black parents "have to be harder on our boys to make sure that they're not a statistic."

{¶105} Regarding the disciplinary methods she and Chambers used with the children, Dotson-Chambers testified that they usually take away access to electronic devices. Sometimes Chambers would make V.L. "hold up some water jugs or he could do some push-ups or sit at the table and read a book, but mostly just no electronics." She readily admitted that Chambers would spank or "whoop" V.L. and brother, which she believed was appropriate discipline. She knew that he would use a belt to spank V.L. and brother on their buttocks. Although she would not be in the room when Chambers spanked the children, from what she could hear, Chambers would hit the child one time, talk to the child about what he had done wrong, hit the child one time, and talk to him again, as opposed to "a rapid, pop, pop, pop, pop ...." The whooping "usually didn't last long" and she never saw the children crying afterward; the children would "come back down and they just join as if nothing happened."

{¶106} Because of V.L.'s behavioral issues, sometime before he ran away, Chambers enrolled him in a "behavior modification boot camp." According to Dotson-Chambers, the program "works with children that have behavior problems trying to discuss some other alternatives to them acting out, shows them some of the consequences and try and scare them straight ... in a sense." It was an overnight program that only lasted about ten hours. After V.L. ran away, Chambers contacted the man

33

who runs the program to ask when the next class was so that he could reenroll V.L.

{¶107} Turning to specific issues with V.L., Dotson-Chambers confirmed that V.L. has asthma, and testified that he gets frequent nosebleeds. She also said that there had been "some concerns for bullying" at every school V.L. had attended. As an example, she testified to emailing one of V.L.'s teachers about six months before the October 7 incident to report that another student had been using racial slurs in class. In general, V.L. had issues with "not wanting to follow the rules at school." He would be on his computer instead of doing schoolwork and "had a few altercations with other students." One of those altercations involved another student calling V.L. names despite V.L.'s requests for the student to stop, so V.L. poked the other student, and the other student retaliated by pushing V.L. into a wall. V.L.'s grade card for the 2021-2022 school year, when he was living with her and Chambers, showed that he received almost all As and Bs. A printout of his grades for the first two quarters of the 2022-2023 school year, when he was primarily living with Lacy, showed that he received mostly Cs, Ds, and Fs.

{¶108} During the first month and a half of the 2022-2023 school year, V.L.'s school documented numerous incidents of his misbehavior, which it provided to Chambers and Dotson-Chambers. Among the problems in this report were sneaking food into class, talking during independent work and tests, not asking for printed homework when his computer was broken, being off task and reading a book that was not his assigned work, uniform violations, messing around and falling out of his seat, having his cellphone in his pocket, falling asleep several times in the same class, throwing something at the school building after being told to throw it in the gravel, and "trying to swat a fly, off task not working on work then marching in the class during an activity."

34

{¶109} The report also included notes from school staff about communications with V.L.'s parents, which addressed some of his behaviors, noted when teachers responded to his parents' emails, and informed his parents when he was not completing schoolwork and was in danger of failing a class. There is also a note indicating that a staff member took a statement from V.L. about a bullying incident. Some of the behavioral incidents were confirmed with emails between Dotson-Chambers and school staff. She believed that one email chain showed a pattern of "messing around" and "inappropriate" behavior when V.L. was living with Lacy after running away from Chambers's house.

{¶110} The day V.L. ran away, sister called Dotson-Chambers crying and hysterical because she thought that somebody had taken V.L. When Lacy called to ask what Dotson-Chambers knew about the situation, Dotson-Chambers told her that she was unsure, but thought that it might be "because [V.L.] was put on punishment two days ago and his phone was taken and that he had left because [sister] can't find him." Dotson-Chambers and Lacy drove around separately looking for V.L. An hour or so after they began searching, Lacy called Dotson-Chambers and told her that "she had [V.L.] and she wasn't letting him come back because she said he was being mistreated at [Chambers's] house."

{¶111} When Dotson-Chambers reviewed text messages between her, Chambers, and Lacy, she did not find any messages from Lacy telling Chambers that he was not allowed to have possession of V.L.

{¶112} Turning to October 7, Dotson-Chambers became aware that something was going on at the house when she got an alert from the doorbell camera app on her phone. She knew that Chambers was going to get V.L. from school to have a talk with him because V.L. would run away from Dotson-Chambers when she came to pick sister up after school (presumably because he thought that Dotson-Chambers was going to try to take him home with

35

her) and they had received the list of V.L.'s behavioral incidents from school the day before. She saw Chambers pulling into the driveway, so she switched to the interior camera on their surveillance system so she could watch what Chambers said to V.L. After waiting a couple of minutes for them to come inside, she switched back to the doorbell camera to see what was taking them so long. She saw V.L. "trying to take off running and Bryan had just got him out of the car and [V.L.] tried to take off running and Bryan grabbed him and they both fell in the grass."

{¶113} Out of an abundance of caution, Dotson-Chambers reported the incident to her supervisor at LCCS. She showed the supervisor the video and explained that she did not have any concerns of abuse, which the supervisor agreed with. According to Dotson-Chambers, that was "pretty much it." However, she later said that she attempted to send the videos to her supervisor's supervisor by text message so they could make a report to Wood County Children Services. She was able to send the shorter videos but had difficulty sending the longest one. Although she tried to cut that video into smaller segments, she was "in shock still that all of this stuff happened and [she] didn't get to send that [long] one." When she texted the videos to her neighbors, she ran into the same issue with the longest video's file being too large to send by text message.

{¶114} To explain the gaps in the video footage, Dotson-Chambers told the jury that the doorbell camera records whenever it picks up movement but will "stop recording and then start back up." She denied deleting any of the videos from the doorbell camera; she downloaded all of the videos, and they were all stored on her cellphone. She did not find anything when she checked her deleted items folder to see if she accidentally deleted a video file. She also said that she contacted the service provider to find out if video had been deleted, which would account for the four-minute gap in the footage, and had volunteered to provide her phone to the state for it

to examine, which it had not done. Additionally, Dotson-Chambers denied altering any of the videos to try to protect Chambers. The only alteration she made was trying to shorten the longest video so that she could send the file by text message, but she claimed that "the whole video is still there." She said, "I'm not going to cover up for nobody, not when it comes to a kid."

{¶115} On cross, Dotson-Chambers said that she "believe[s] that children can be disciplined reasonably by their parent ...." She agreed with the prosecutor that, although parents are allowed to physically discipline their children, there is a line between corporal punishment and causing a child serious physical harm. She did not believe that strangling or intentionally breaking a bone were appropriate forms of discipline.

{¶116} Regarding Lacy's motion for emergency custody of V.L., Dotson-Chambers said that V.L. "lied and told [Lacy] something happened at the house[,]" but conceded that Lacy had sufficient concerns about V.L.'s treatment at Chambers's house to warrant filing her custody motion.

{¶117} The morning of October 7, Chambers told Dotson-Chambers that he was going to get V.L. from school and take him to their house because V.L. "had ran away and he wouldn't come home." Under "other" circumstances, Dotson-Chambers agreed with the prosecutor that the best place for a child who is having difficulties in school is at the school but said that the best place for a child who had run away from home is at the home. She was unaware of any appointment with, as the prosecutor put it, "somebody outside of the family" scheduled for V.L. that day. The only appointment he had was a "[o]ne-on-one appointment with his dad."

{¶118} Dotson-Chambers did not recall trying to speak to Chambers through the doorbell camera app because "[e]verything happened really fast and [she] was in shock."

37

{¶119} Dotson-Chambers knew how to watch footage from the doorbell camera, download videos, and delete videos in the doorbell camera app but did not know how to use any other features in the app. In addition to Dotson-Chambers and Chambers, sister had access to the doorbell camera account. At the time of the incident, Chambers was with V.L. and sister was at school without her phone.

{¶120} Dotson-Chambers insisted that she did not delete any portions of the doorbell camera video from that morning. According to her, "[a]s far as anything that is missing, sometimes the [doorbell camera] records, sometimes it doesn't record. I don't have any control over that .... [I]t cuts on and off. Sometimes the Wifi go out. I mean, it is just different things that unfortunately, I have no control over." She believed that "[i]f [video] was recorded ..." the service provider should have been able to produce it in response to the search warrant.

{¶121} Dotson-Chambers explained that she sent the videos to Starr because Starr is her friend, she heard Starr screaming on the video, and she was trying to get Starr to understand that Chambers was not hurting V.L. She was not trying to find out what Starr saw; she wanted to ensure that Starr understood the whole incident. She was not surprised to learn that Starr testified to first seeing a portion of the video footage during trial. She reiterated that she was unable to send one of the video files by text message because it was too large.

{¶122} Dotson-Chambers spoke to the Wood County caseworker investigating the case. She told the caseworker that the videos did not show Chambers punching V.L., but she "can't argue that" V.L. had petechiae. Although she loves her husband, Dotson-Chambers would not do "anything" for him.

**b. Other witnesses**

{¶123} In addition to Dotson-Chambers, Chambers

38

presented the testimony of brother and Kynard, an LCCS caseworker who is Dotson-Chambers's coworker.

{¶124} Brother, who is autistic, briefly testified about Chambers's disciplinary methods. He never saw Chambers disciplining V.L. but "can hear it." He would hear screams and crying, and V.L. would look sad when he came downstairs.

{¶125} Kynard testified that, although she works with Dotson-Chambers, she does not know Chambers personally. On October 7, Dotson-Chambers came to Kynard's desk to show her video of Chambers bringing V.L. home. In the video, Chambers was trying to get V.L., who was fighting him, into the house. Because V.L. was fighting, Chambers "had him on the ground and was like trying to restrain him from running away. And so [Chambers] was like standing over him with his hands like holding the kid down." After that, Kynard saw V.L. get up to try to run away a second time, Chambers "again put [him] back on the ground trying to get him to stop running away[,]" a phone fall to the ground, neighbors come outside, and V.L. get up and run. She thought that the video lasted between five and ten minutes.

{¶126} Before Dotson-Chambers showed Kynard the video, Kynard heard her calling out "his" name through the doorbell camera app on her phone.

{¶127} When Chambers's attorney asked Kynard if she felt that Chambers's actions were "appropriate given the situation[,]" she said that she was not testifying in "the capacity of [her] job" and did not think that she had all of the facts necessary to make that determination. She reported this incident to her supervisor, "but it was already reported before [she] reported it."

{¶128} Detectives interviewed Kynard about this incident. She gave them essentially the same version of events that she testified to at trial. She said that

39

she felt "blind-sided" by the interview because she initially thought that the detectives wanted to speak with her in a professional capacity related to one of her cases. She "didn't know kind of what they were questioning [her] about so [she] didn't know the ramifications of what everything was." The detectives did not show her or talk to her about any other documentation related to Chambers's case.

{¶129} On cross, Kynard characterized what V.L. was doing in the video as "trying to get away from" Chambers as opposed to fighting with Chambers. She could not recall the exact sequence of events in the video she saw but did not see Chambers go up to the car to ask V.L. a question and thought that the first thing she saw might have been the cellphone falling to the ground. She also said that the detectives did "not really" force her to continue after she told them that she was not comfortable answering questions. However, she said that they "kind of told me that I kind of like have to answer them because I am a witness to this for the [doorbell] camera ...."

### c. Chambers's testimony

{¶130} Finally, Chambers took the stand in his own defense. Around 2016, he and Lacy agreed to him taking custody of V.L. because V.L. was having issues that Lacy was unable to handle, and V.L. wanted to live with Chambers.

{¶131} Chambers said that he and V.L. had a very good relationship. Before the incident on October 7, V.L. had never been a "rebellious child." Chambers, who was an over-the-road truck driver, would talk to his children daily to ask about what was going on in their lives, make sure they were doing their chores, and see how school was going. He would attend doctor and counseling appointments in person when he was home and through a video app when he was out of town.

{¶132} To punish V.L., Chambers would take away videogames or make V.L. "[w]rite sentences," read a book, hold up water jugs, or do push-ups and jumping jacks. To clarify what a "whooping" meant in his house, Chambers explained that he would take the offending child to an upstairs room, which eliminated the humiliation of the other children laughing at the child being punished, spank the child with his belt, and talk to the child between spankings about what they needed to do to correct their behavior. Over V.L.'s lifetime, Chambers estimated that he had whooped V.L. a total of 30 to 40 times. He was strict with V.L. because of V.L.'s ongoing pattern of problematic behaviors and said that "it was all about getting him in order."

{¶133} Chambers thought that V.L.'s behavioral issues had "went times ten" since he went back to living with Lacy, and he was trying to address and correct the problems. He said that the "plan" he referred to in one of his text messages to Dotson-Chambers included reenrolling V.L. in the boot camp program and getting him from school when he got home from his work trip. As part of that plan, Chambers contacted the man who operates the boot camp program shortly after V.L. ran away to inquire about reenrolling him. This part of the plan fell through because one of V.L.'s older brothers did not bring V.L. to the camp. Chambers resorted to taking V.L. from school to talk about his behavior because Lacy would not reply to his text messages about V.L.'s escalating behavioral incidents at school. Chambers's text messages telling V.L. to enjoy himself while he could and that V.L. "made it worse" were in response to V.L.'s behaviors continuing to escalate. He sent the "made it worse" text the day V.L. ran away, which happened while Chambers was working out of town.

{¶134} For the two weeks leading up to October 7, Chambers had been asking V.L. about his grades and behavior at school. According to Chambers, he had been saying to V.L., "look, you got something you want to tell me? No matter what, I'm trying to

41

get it out you now. What you got to tell me, anything going on?" V.L. consistently denied any issues at school. However, that morning, Chambers was able to access the school's online grade system and was able to see what V.L.'s grades actually were.

{¶135} When Chambers picked V.L. up from school, V.L. was "fidgety ... [and] his eyes got big ...." V.L. did not seem to expect Chambers. As they left the school, V.L. tried to go back in. Chambers grabbed him and said that V.L. was "trying to fall down and stuff like that ..." so Chambers "pick[ed] him up and put him in the car." Chambers described what he was doing in the school surveillance video as "trying to get [V.L.] to get up and walk for real but he wasn't going for it." As he was trying to get V.L. into the car, Chambers had his hands on V.L.'s arms, back of his shirt, back of his neck, hands, and back of his head. Chambers "pinned him down" twice and then "pushed" V.L. into the car and told him to sit down. Chambers denied banging V.L.'s head against the window or punching him. He had the child locks activated on the back doors of the car because he was concerned that V.L. would open the door in traffic and jump out. The fact that V.L. previously "ran away for no reason" made Chambers concerned about V.L. trying to jump out of the car.

{¶136} During the short drive from the school to Chambers's house, Chambers explained to V.L. what he was doing and why and that Chambers had received a progress report from school outlining V.L.'s problematic behaviors in August and September. V.L. was on his phone during the drive.

{¶137} Chambers reviewed the doorbell camera video footage. In the video that shows him getting V.L. out of the car, he asked V.L. which way V.L. wanted to go because V.L.'s back was to him, and he was asking V.L. which direction he wanted to exit the car. As Chambers was trying to get V.L. into the house, he grabbed V.L.'s arms and had his hands on V.L.'s wrist. Next, Chambers described himself pushing down on V.L.'s shoulders and asking

42

"[w]hen you gonna stop?" V.L. started coughing soon after Chambers got him out of the car, "but not from nothing [Chambers is] doing." Chambers pointed out that his right hand was free and his left was pressing down on V.L.'s shoulder. Chambers threw V.L.'s phone on the ground because he was getting reports from the school about V.L. being on his phone. Chambers recognized the voices of "Liz" and Lacy on the video, and heard Lacy saying "you gonna die." Chambers said that V.L. had blood on his face because Chambers "smacked him earlier in the video with an open hand." The sweatshirt V.L. had on in the video was the same one he was wearing when Chambers picked him up from school and it was not ripped. Presumably at the end of the video, V.L. picked up "a charger and a card."

{¶138} In the video in which V.L. tells Chambers that he is not supposed to be with Chambers, Chambers said he "could just hear his momma talking. That's his momma talking. That's what I was taking it as. No little kid should know what's going on in a legal matter, that's what's going on between two parents. He shouldn't know."

{¶139} In one video, Chambers said that he was talking to V.L. with his hand on the collar of V.L.'s shirt, but he did not have his hands around V.L.'s neck and was not strangling him. He was telling V.L. "about the paperwork in the house and how he be acting up in school."

{¶140} Chambers explained that he told V.L. that he was going to be held responsible for his grades and behaviors because Chambers thought that he ran away after Chambers found out about his performance in school and "by running to his mother's house, he thought he was going to be untouchable ...." In effect, Chambers was "telling him he still going to be held responsible for his actions because he still going to be held to the same standards no matter where he's at."

43

{¶141} Chambers smacked V.L. with the front of his left hand and told him to "[b]e your ass still[,]" which meant "[b]e still, son." He said that he is a "big guy" and thought that he "probably would have broke something" if he had punched V.L. It would have been "easy" for Chambers to hurt V.L. if he wanted to, but that was not his "purpose" or "mission" and he never intended to hurt his son.

{¶142} Chambers denied strangling or punching V.L. during the four minutes that were not recorded by the doorbell camera. He also denied intending to break V.L.'s arm or hurt him in any way. He did not intend to pick V.L. up from school and beat him and would not have picked V.L. up from school that day if he had known that V.L. would be injured.

{¶143} Regarding the emergency custody order, Chambers testified that he knew Lacy filed a motion for custody, knew of the hearing date on September 26, 2022, and asked to have the hearing continued, but he was not personally served with a copy of Lacy's motion and never received a copy of the emergency order. Lacy did not mention the emergency custody order or tell Chambers that he was not to have contact with V.L. in text or phone conversations Chambers had with her after the juvenile court issued the order.

{¶144} As a potential alternate explanation for V.L.'s wrist injury, Chambers testified that V.L. came to his house in 2018 with an elastic bandage on his right arm. He said that he had an accident on his brother's skateboard, which Lacy confirmed. Shortly after that, Lacy "took him away" and Chambers did not see him for a few months.

{¶145} On cross, Chambers explained that V.L. had attended three different schools over approximately four years. He was picked on at these schools because he wore glasses, not because he frequently switched schools. Chambers did not think that V.L. brought snacks to class in an effort to make friends. To help V.L. with his social problems, Chambers

44

gave him "inspirational talks" and explained that the children who tattled on him when he did something wrong were not really his friends. He would talk to V.L. daily to help him with any problems he had.

{¶146} Chambers clarified that he sent the text message that he "had a plan" to Lacy and that his plan involved sending V.L. to the boot camp. The state's exhibits reflect that he sent this message to Dotson-Chambers. Chambers said that he sent the text message telling V.L. to "enjoy yourself while you can" in response to V.L.'s behaviors escalating and after Lacy did not respond to his messages. Chambers believed in, as the prosecutor put it, "scaring someone straight," and sent that text to V.L. to scare him. Chambers disagreed with the prosecutor's assessment that he had been "terrorizing" V.L., which is why V.L. was "scared" of Chambers that morning. Instead, Chambers said, "he was scared because he ... didn't think I was going to come up there.... I be out of town. You never know when I'm coming." V.L. acted like he did not expect Chambers to be at the school—not like he was scared of Chambers—when he walked into the office.

{¶147} Although he believed in spanking his children with a belt, Chambers did not believe in smacking them, and October 7 was the first time that he had ever smacked one of his children. He admitted that he lost control that morning because V.L. was being defiant. He denied having anger issues and disagreed with the prosecutor's assessment that he "went from zero to one hundred pretty frickin' quick ..." in the video. Chambers claimed that his reaction "was a build up" and he "had never seen [his] son act like this toward [him]." He also denied hitting V.L. because he heard Lacy talking through V.L. and was mad at Lacy. In other words, Chambers did not take his anger at Lacy out on V.L. Instead, he reiterated that he heard "a woman talking to a child about grown folk business that he shouldn't even know. It's between [Chambers] and her what's going on."

45

{¶148} The "appointment" that V.L. had on October 7 was with Chambers. He did not consider telling the school that V.L. had an appointment a lie; he believed that, as the custodial parent, he could get his child out of school if he chose to.

{¶149} Chambers described V.L.'s behavior on the school surveillance video like a toddler's, i.e., V.L. "fell down and [Chambers] picked him up." Chambers had to physically move V.L. toward the car because V.L. "wasn't trying to stand up." He had to get into the back seat of the car with V.L. because "as [Chambers] put him in he was trying to come out. [Chambers] pushed him back and said, sit your butt down."

{¶150} The prosecutor had Chambers walk through some type of demonstration of his positioning and the manner in which he smacked V.L., but it is impossible to tell from the transcript what, exactly, Chambers and the prosecutor were showing the jury. However, during the demonstration Chambers said that (1) he never restricted V.L.'s airway; (2) V.L.'s coughing was caused by asthma; (3) he smacked V.L. in the nose with his open left hand; (4) V.L.'s nose bleeds "very, very easily[;]" (5) Chambers was doing "[n]othing" with his hands until he smacked V.L.; and (6) both he and V.L. were "out a breath" because they "had a nice struggle out there."

{¶151} Chambers admitted that he had access to the doorbell camera's app but denied deleting any video footage. He said that sometimes the camera records and sometimes it does not.

{¶152} Chambers denied choking, punching, or dragging V.L. from school against his will. However, he admitted to tackling V.L. and giving him a bloody nose. He said that he has "never and will never hurt [his] damn child." He did not think that giving V.L. a bloody nose constituted hurting him. In the end, Chambers believed that "[a] child should always do what they parent tells them, no matter what the

situation is ... [and] should never tussle with their parent[,]" but denied that "it's all [V.L.'s] fault ...."

## C. Outcome and sentencing

{¶153} The jury found Chambers guilty of both charges.

***

{¶157} The court sentenced Chambers to "a term of 10 years" for the kidnapping conviction and "6 years" for the felonious assault conviction. It ordered him to serve the sentences concurrently "for a total stated prison term of 10 years." It went on to tell him that his "minimum stated sentence as to [the kidnapping conviction] is 10 years and your maximum stated sentence is 15 years with a 5-year indefinite tail. Your total minimum stated sentence is 10 years and your total maximum stated sentence is 15 years."

*State v. Chambers,* No. L-23-1068, 2024 WL 4003528, at *1–24 (Ohio Ct. App. Aug. 30, 2024).

## Procedural background

*Direct appeal*

In March 2023, Chambers filed in the Ohio court of appeals a timely notice of appeal. Doc. 11-1, at 23 (Exhibit 9). In his brief, Chambers, through new counsel, raised the following assignments of error:

> 1. Did the trial court properly eliminate the affirmative defense of parental discipline because it only applies to domestic violence? Appellant says this must be answered in the negative, as no right of a child, including the right to not being terrorized, injured, moved, or restrained, should trump a parent's right to give proper and reasonable discipline.

47

2. Was there sufficient competent, credible evidence to support the convictions for kidnapping and felonious assault where nothing demonstrated that appellant acted knowingly or purposefully and seriously injuring or terrorizing V.L., or that V.L. was seriously injured by appellant? Appellant says no, as there is nothing in the record to support that appellant was doing anything but moving, controlling, and restraining his fleeing, fighting, and defiant son when his son brought about any injury he sustained while being a disrespectful and defiant teenager.

3. Did the trial court properly deny merging the convictions for kidnapping and felonious assault where appellant's actions were one course of conduct and the convictions were resulting from allied offenses of similar import? Appellant argues no, as both charges stem from appellant's necessary-forceful removing, apprehending, restraining, moving, locking-in, and transporting of V.L.[1]

Doc. 11-1, at 49 (Exhibit 13). The State, in turn, raised the following cross-assignment of error regarding Chambers's sentence as to count three, the felonious assault conviction:

Pursuant to the recently enacted Reagan Tokes Act, all defendants convicted of a non-life felony of the first or second degree that was committed on or after March 22, 2019 must receive an indefinite sentence.

Doc. 11-1, at 106 (Exhibit 14). On August 30, 2024, the Ohio court of appeals affirmed in part and reversed in part the trial court's judgment. *Id.* at 120–202 (Exhibit 16). The court rejected Chambers's assignments of error and sustained

---

[1]     In this report and recommendation, Chambers's grounds for relief are reproduced as written.

48

the State's assigned error. *Id*. It therefore remanded to the trial court for resentencing on count three.

On September 7, 2024, Chambers filed in the Ohio court of appeals an Ohio Appellate Rule 26(A)(1) application for reconsideration. Doc. 11-1, at 203 (Exhibit 17). Chambers asked the court to reconsider its position on Chambers's reasonable-parental-discipline-defense argument. *Id*. On October 30, 2024, the Ohio court of appeals denied Chambers's application for reconsideration. *Id*. at 216–18 (Exhibit 19).

Chambers did not appeal either of the Ohio court of appeals' decisions.

*Resentencing*

On October 23, 2024, the trial court issued a judgment entry on the re-sentencing hearing that it held on October 10. Doc. 11-1, at 219–21. At the hearing, Chambers was represented by appointed counsel. *Id*. The court sentenced Chambers on count three to the minimum, six-year prison term. *Id*. at 221. The court wrote that the "maximum stated prison term" on that count is nine years. *Id*. The court ordered the sentences on counts two (ten years) and three to run concurrently, for a total minimum sentence of ten years and a total maximum sentence of fifteen years. *Id*.

Chambers did not appeal this decision.

*Ohio Appellate Rule 26(B) application to reopen direct appeal*

On December 23, 2024, Chambers filed in the Ohio court of appeals an untimely, pro se Ohio Appellate Rule 26(B) application to reopen his direct

49

appeal.[2] Doc. 11-1, at 222 (Exhibit 21). A week later, he filed an amended application to reopen. *Id.* at 246 (Exhibit 22). In his application, Chambers alleged that his appellate counsel was ineffective for failing raise on direct appeal the following issues:

> Trial counsel failed to file a motion to dismiss on statutory speedy trail grounds….Trial counsel also did not file a motion to suppress evidence due to the illegal search and seizure of my phone. Also upon being arrested I was not read my Miranda rights all was captured on Officer Robert Wilcox bodycam and trial counsel had access. There was prosecutorial misconduct for editting the ring videos to cut out certain parts and if jury would have seen the video in its entirety they would have came with a different verdict….[police personnel] falsified police report… Trial counsel did not argue the fact my sons wrist was not broken when on rebuttal prosecutor lied and had Natalie Jones testify to a record she didn't write.

*Id.* at 248–49. On February 6, 2025, the Ohio court of appeals denied Chambers's application, finding that it was untimely and that Chambers failed to show good cause to excuse its untimeliness. *Id.* at 279 (Exhibit 24).

Chambers did not appeal.

*Petition to Vacate or Set Aside Judgment of Conviction or Sentence*

On February 25 2025, Chambers filed in the trial court an untimely petition to vacate or set aside judgment of conviction or sentence. Doc. 11-1, at

---

[2]    A Rule 26(B) application to reopen is the method to raise ineffective assistance of appellate counsel. *See* Ohio App. R. 26(B)(1). An application must be filed "within ninety days from journalization of the appellate judgment [on direct appeal] unless the applicant shows good cause for filing at a later time." *Id.*

50

281 (Exhibit 25). In his petition, Chambers presented the following claims:

> 1. Officer Robert Wilcox, Detective Linda Fauver, and Karie Hayes violated my Fourth Amendment with an illegal search and seizure and not being read my Miranda rights upon being handcuffed and transported the northwest station its all on body cam.
>
> 2. Ineffectiveness of trial counsel, Right to speedy trial. Trial counsel failed to call orthopedic surgeon who had done the examination on my son or any other medical expert in my defense. Trial counsel failed to call Julia Syring my sons counselor at Harbor Behavioral she would have testified the allegations of abuse was never reported on me. Trial counsel did not file a motion to dismiss on statutory speedy trial. Trial counsel did not produce the unedited ring videos that would have shown how my son got the marks on his neck. Trial counsel did not object to the prosecution introducing a medical record in which the witness wasnt the examine.

*Id.* at 283, 289 (Exhibit 25). Chambers also filed a motion for appointment of counsel and for expert assistance "seeking funds for an orthopedic surgeon in [the] hopes of showing V.L.'s wrist injury was the result of a previous incident." *Id.* at 320, 354. On June 17, 2025, the trial court dismissed as untimely Chambers's petition. *Id.* at 321–23, 328 (Exhibit 27). The court also, in the alternative, denied Chambers's petition as meritless and barred by res judicata, and denied his motions for counsel and an expert. *Id.* at 323–28.

Chambers did not file an appeal.

51

*Federal habeas corpus petition*

Chambers states that on May 30, 2025, he placed in the prison mailbox his federal habeas corpus petition.[3] Doc. 1. In his Petition, he raises the following grounds for relief:

> **Ground one**: illegal search and seizure/Fourth Amendment
>
> *Supporting facts:* I have the body cam footage from the October 7th 2022 incident where Robert Wilcox performed an illegal search and seizure of my phone when you can hear me say I don't consent to any illegal searches or seizures.
>
> **Ground two**: Procedural due process/Fourteenth Amendment
>
> *Supporting facts:* On Officer Robert Wilcox body cam after he performed the illegal search and seizure he handed the phone to Officer Karie Hayes and she proceeded to look through my phone without a warrant and at that present time I was not under arrest.
>
> **Ground three**: Speedy trial violation/Sixth Amendment
>
> *Supporting facts:* On the day of trial Lucas County Common Pleas has scheduled two trials. The trial of Daniel Huggins and the trial of Bryan Chambers. Daniel Huggins decided he was going to trial and not take a plea deal in which it pushed my trial back Trial counsel should have filed for a dismissal and didn't This action happened January

---

[3]    A petition is deemed filed when a petitioner places it the prison mailing system. *Houston v. Lack*, 487 U.S. 266, 270 (1988).

17th, 2023.

**Ground four:** Due Process/Fourteenth Amendment

*Supporting facts:* The courts would not allow Shawn Mahomes to testify about my sons behavior and why I had enrolled him in Shawns behavioral boot camp.

Doc. 1, at 5–10. Chambers then filed an Amended Petition and added the following three grounds:

**Ground five:**[4] ineffective assistance of trial and appellant counsel

*Supporting facts*: Both had the body cam footage and neither produced it at trial or on direct appeal I got the footage from the appeal lawyer.

**Ground six:** Prosecutorial misconduct

*Supporting facts*: The prosecutor repeatedly said that there was a broken wrist and I have evidence there wasn't. The victim lied on the stand concerning the injury along with Shaliah Lacy and the nurse practitioner Natalie Jones. Enclosed is a list of injuries that litigation has begun in a civil matter and a broken wrist the catalyst for the Felonious assault is not on there.

**Ground seven:** Miranda Rights

*Supporting facts*: upon coming to my home Detective Fouver immediately begin questioning me without reading my rights as seen on video body cam.

---

[4]     Chambers labeled these grounds one through three. Doc. 9, at 5– 8. To avoid confusing these grounds with the original ones, I renumber them, picking up where the Petition left off.

53

Doc. 9, at 5– 8. The Warden filed a Return of Writ, Doc. 11, and Chambers filed a traverse, Doc. 15.

**Legal Standard**

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, 110 Stat. 1214, petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). But when state court remedies are no longer available, procedural default rather than exhaustion applies. *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b),(c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982)

(per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts") (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). And a habeas petitioner must present both the factual and legal underpinnings of the claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the "petitioner must present his claim to the state courts as a federal constitutional issue— not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).

   *Procedural default*

   Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id.* In *Maupin v. Smith,* the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: whether (1) there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) the state court enforced the

procedural rule; (3) the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 847). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. While the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review, *Williams*, 460 F.3d at 806.

To overcome a procedural bar, petitioners must show cause for the default and actual prejudice that resulted from the alleged violation of federal law that forms the basis of their challenge, or that there will be a fundamental

56

miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

If a state's courts adjudicated the merits of a claim, a habeas petitioner may obtain habeas relief under 28 U.S.C. § 2254, if the petitioner can establish one of two predicates. To establish the first predicate, the petitioner "must identify a 'clearly established' principle of 'Federal law' that" has been established by a holding of the Supreme Court. *Fields v. Jordan*, 86 F.4th 218, 231 (6th Cir. 2023) (en banc); *see* 28 U.S.C. § 2254(d)(1). The petitioner must then show that state's court's adjudication "was *contrary to*," or "involved an *unreasonable application* of" that "clearly established" precedent. 28 U.S.C. § 2254(d)(1) (emphasis added); *see Fields*, 86 F.4th at 232.

To establish the second predicate, the petitioner must show that the state's court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or" based on "a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal

principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A]n 'unreasonable application of'" the Court's holdings is one that is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).

"[A] 'clearly established' principle of 'Federal law' refers to the "holdings," not "dicta," of the Supreme Court's decisions. *Fields*, 86 F.4th at 231 (quoting *White*, 572 U.S. at 419). A state court is not required to cite Supreme Court precedent or reflect an "awareness" of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard. *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks

merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

**Discussion**

1. *All of Chambers's grounds are procedurally defaulted because Chambers failed to appeal any state court ruling to a higher court.*

All of Chambers's grounds for relief are procedurally defaulted because Chambers didn't appeal any of the state court rulings on his claims to a higher court. So he failed to pursue his claims through the state's "ordinary appellate review procedures," as he is required to do. *See Williams*, 460 F.3d at 806 (a petitioner must raise a claim in state court "and pursue that claim through the state's 'ordinary appellate review procedures'"); *see O'Sullivan*, 526 U.S. at 845 (a petitioner must present a claim to the state appellate court and the state supreme court for discretionary review or it is procedurally defaulted).

Chambers procedurally defaulted his claims in other ways, too, described below.

59

### a. Grounds one, two, three, five, and seven

Chambers presented in his state post-conviction petition grounds one (illegal phone search and seizure by Officer Wilcox), two (illegal phone search and seizure by Officer Hayes), three (speedy trial violation), five (ineffective trial and appellate counsel for failing to produce body-cam video at trial and on appeal) and seven (*Miranda* violation[5]). *See* Doc. 1, at 5–8; Doc. 9, at 5, 8; Doc. 11-1, at 283, 289. But the trial court denied his petition as untimely. Doc. 11-1, at 321–23. When it did, it enforced a procedural bar foreclosing federal habeas review. *See Smith v. Warden, Toledo Corr. Inst.*, 780 F. App'x 208, 219 (6th Cir. 2019) (claims raised in a post-conviction petition that the state court denies as untimely are procedurally defaulted under the *Maupin* test) (citing *Walker v. Martin*, 562 U.S. 307, 310–11 (2011)).

The trial court also found that Chambers's claims were barred by res judicata because Chambers could have, but did not, raise them on direct appeal. Doc. 11-1, at 326; *see Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) ("Ohio courts have consistently held that claims that can be adjudicated based on facts in the record can only be presented on direct appeal") (citing *State v. Lentz*, 639 N.E.2d 784, 785 (Ohio 1994)). Because Chambers did not raise his trial-court claims on direct appeal, they are procedurally defaulted. *See Buell*, 274 F.3d at 349 (claims that the petitioner failed to raise on direct appeal were

---

[5]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

60

procedurally defaulted); *Coleman v. Mitchell*, 268 F.3d 417, 427 (6th Cir. 2001) (claims raised in a post-conviction petition that the state court denies on the basis of res judicata are procedurally defaulted) (citing *State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967)).[6]

### b. Ground six

In ground six of his Amended Petition, Chambers raises a procedural misconduct claim. Doc. 9, at 7 (alleging that the State lied about whether Chambers's son's wrist was broken). Chambers raised this claim as a reason appellate counsel was ineffective in his Ohio Appellate Rule 26(B) Application to reopen. Doc. 11-1, at 248 (Chambers's Rule 26(B) application arguing that appellate counsel was ineffective for failing to raise, on direct appeal, claims of ineffective trial counsel, a speedy trial violation, and prosecutorial misconduct about whether Chambers's son's wrist was broken). But Chambers's procedural misconduct claim is procedurally defaulted because "bringing an ineffective assistance claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because 'the two claims are analytically distinct.'" *Davie v. Mitchell*, 547

---

[6]     The trial court alternatively denied Chambers's petition on the merits. Doc. 11-1, at 323–26. This alternative finding does not change the fact that Chambers's claims are procedurally defaulted. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state [procedural default] holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

F.3d 297, 312 (6th Cir. 2008) (quoting *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005)). And Chambers didn't present a stand-alone procedural-misconduct claim to the state courts.

Moreover, the Ohio court of appeals denied Chambers's Rule 26(B) application as untimely, Doc. 11-1, at 279, which is a separate reason why any claim he may have raised in his Rule 26(B) application is procedurally defaulted. *See Parker v. Bagley*, 543 F.3d 859, 861–62 (6th Cir. 2008) (claims raised in a Rule 26(B) application that the Ohio court of appeals rejected as untimely are procedurally defaulted); *Monzo v. Edwards*, 281 F.3d 568, 577–79 (6th Cir. 2002).

### c. Ground four

Finally, Chambers failed to present to any state court ground four—a claim that the trial court violated Chambers's due process rights when it prevented Shawn Mahomes's testimony about Chambers enrolling his son in Mahomes's "boot camp." Doc. 1, at 10. Chambers claims that he "tried" to raise this claim in his postconviction petition but "the judge did not elaborate on it in her findings." Doc. 9, at 7. Review of Chambers's postconviction petition, however, shows that Chambers did not mention anything about Mahomes's testimony. Doc. 11-1, at 281–92; *see McMeans*, 228 F.3d at 681 (a claim is only considered "fairly presented" when the petitioner asserts both the factual and legal bases for that claim to the state courts). Chambers failed to present ground four to any court, so it is procedurally defaulted. *See id.*

*2.      Chambers has not shown that his procedural default should be excused*

In his Traverse, Chambers has not alleged cause to excuse his procedural defaults. To the extent that his ineffective-assistance-of-appellate-counsel claims could be considered cause to excuse the procedural default of any claim not raised on direct appeal, any such claim would fail. This is so because although ineffective assistance of appellate counsel can serve as cause to excuse a procedural default, it may only do so if the ineffective-assistance claim is not itself procedurally defaulted. *See Edwards v. Carpenter*, 529 U.S. 446, 451–53 (2000). Here, Chambers procedurally defaulted any ineffective-assistance-of-appellate-counsel claims because (1) the Ohio court of appeals denied his application as untimely and (2) he failed to appeal the Ohio court of appeals' ruling to the Ohio Supreme Court.

In his Amended Petition, Chambers asserts that the reason that he failed to exhaust grounds five (ineffective assistance of counsel) and seven (*Miranda* violation), which he raised in his postconviction petition, was that the time was running out to file his federal habeas petition. Doc. 9, at 6, 10. While this may explain why he didn't appeal to the state appellate courts, it doesn't explain why his state postconviction petition was untimely to begin with. Moreover, Chambers hasn't shown that at that time, the one-year limitations period for filing a habeas petition was nearing expiration.

Chambers relies on actual innocence to excuse his procedural default. Doc. 15, at 2, 10. In order to show that he suffered a fundamental miscarriage

63

of justice such that his is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Murray v. Carrier*, 477 U.S. 478, 496 (1986), Chambers must provide "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," *see Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Chambers hasn't provided new evidence showing actual innocence. He cites the fact that x-rays of his son's wrist at the emergency room were negative, *see* Doc. 12-2, Doc. 15, at 2, but this information was presented at trial, *see Chambers*, 2024 WL 4003528, at *15. Chambers argues that he was the custodial parent of his child, so he could not have kidnapped him. Doc. 15, at 4, 10. Information about custody arrangements and Chambers's knowledge of these things were presented at trial. *Chambers*, 2024 WL 4003528, at *7, 12, 22–23. Also presented at trial was information indicating that Chambers's son had behavioral problems at school, a fact that Chambers also mentions. Doc. 15, at 2; *Chambers*, 2024 WL 4003528, at *17. And the doorbell camera videos that Chambers cites, Doc. 15, at 4, were played at trial, *Chambers*, 2024 WL 4003528, at *4. None of these items are new evidence that wasn't presented at trial. *See Schlup*, 513 U.S. at 324.

Chambers writes that "body cam" footage from the responding police officers shows that they seized and searched his phone, Doc. 15, at 4–5, but he doesn't explain how this footage would show his innocence. The same is true

64

as to Chambers's allegation that he wasn't given his *Miranda* warnings. *Id.* at 5; *see United States v. Patane*, 542 U.S. 630, 641 (2004) ("Potential [*Miranda*] violations occur, if at all, only upon the admission of unwarned statements into evidence at trial."). Chambers says that testimony from "Shawn Mahomes," who operated a "boot camp program" his son participated in, *Chambers*, 2024 WL 4003528, at *1–2, would have "shed[] a better light in favor of justice" had the trial court allowed it. Doc. 15, at 6. But Mahomes was not present for the events on October 7, 2022, so he could not have testified as to what happened that day. *Chambers*, 2024 WL 4003528, at *1.

Chambers has not shown actual innocence to excuse his procedural defaults.

### 3. *Chambers's motions are denied*

Chambers has filed three related motions: a motion for an evidentiary hearing, Doc. 17; a motion for a case conference to "check the status," Doc. 18; and a motion for appointment of counsel for "future court hearings," Doc. 16.

Section 2254(e) of Title 28 of the United States Code provides that a state court's determination of the facts is presumed to be correct, and a petitioner must show clear and convincing evidence to rebut this presumption. 28 U.S.C. § 2254(e)(1). Section 2254(e)(2) states that if a petitioner failed in state court to develop the factual basis of a claim, the district court "shall not hold an evidentiary hearing on the claim unless the applicant shows" that the claim relies on (1) "a new rule of constitutional law"; or (2) "a factual predicate

that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(i),(ii). The petitioner must also show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B).

Chambers hasn't "specified what could be discovered through an evidentiary hearing," so he hasn't shown that he is entitled to one. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). Moreover, all of Chambers's claims are procedurally defaulted, barring court review. *See id.* I therefore deny Chambers's motion for an evidentiary hearing and a case conference, and his attendant motion for appointment of counsel.

### Conclusion

For the reasons set forth above, I recommend that Chambers's Petition and Amended Petition be dismissed. Chambers's motions for a hearing, conference, and appointment of counsel, Docs. 16, 17, and 18, are denied.

Dated: April 1, 2026

 /s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).